IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| NET RESULTS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04-1376 C |
| | ) | |
| THE UNITED STATES, | ) | Judge Lawrence M. Baskir |
| | ) | |
| Defendant. | ) | |

PLAINTIFF'S OPENING BRIEF FOR CLAIM CONSTRUCTION

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................... 1

II. Description of Patent-in-Suit and Relevant Claims ............................... 2

A. Overview of the Patent-in-Suit Technology ....................................... 2

B. Phrases to be Construed as Presented in the Claims at Issue .......... 4

III. LEGAL STANDARD GOVERNING CLAIM CONSTRUCTION .......... 6

IV. CONSTRUCTION OF TERMS .......................................................... 8

A. "Mine Detection System" Properly Construed Includes the Parameters of High Probability of Detection and Low Probability of False Alarm. ........................................................................................ 10

B. "Housing" is a Protective Enclosure for Containment of an Apparatus Used to Prevent Damage in Handling or Operation. ............................. 15

C. "Said Metal Detector Coils Concentrically Surrounding Said Antenna" Properly Construed Means That the Metal Detector Coils and the Antenna(s) Have a Common Center Point and Are in the Same Horizontal Plane. ....................................................................... 22

CONCLUSION........................................................................................ 29

# TABLE OF AUTHORITIES

## Cases

Bell Atl. Network Servs. v. Covad Commc'ns Co., 262 F.3d 1258 (Fed. Cir. 2001)……………………………………………………………………8

Graham v. John Deere Co., 383 U.S. 1 (1966)………………………………7

Innova/Pure Water, Inc. v. Safari Water Filtration Sys., 381 F.3d 1111 (Fed. Cir. 2004)………………………………………………………..6, 7

Markman v. Westview Instruments, Inc., 52 F.3d 967 (Fed. Cir. 1995)……………………………………………………..6, 7, 8

Panduit Corp. v. Dennison Mfg. Co., 810 F.2d 1561 (Fed. Cir. 1987)……...6

Phillips v. AWH Corp., 415 F.3d 1303 (Fed. Cir. 2005)………………..6, 7, 8

Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313 (Fed. Cir. 2002)...7, 28

Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576 (Fed. Cir. 1996)..........................................................................8, 13, 18

## LIST OF EXHIBITS

1. U.S. Patent No. 5,680,048 (the "'048 patent")

2. Claim Construction of the Patent in Suit dated Nov. 28, 2007

3. Office Action, '048 Patent File History (Jan. 16, 1997)

4. Amendment and Response, '048 Patent File History (Feb. 13, 1997)

5. Excerpt from deposition transcript of Dr. Lloyd Riggs dated May 22, 2008

6. Expert report of Dr. Lloyd Riggs dated April 25, 2008

7. Expert report of Dr. Dean L. Mensa dated Jan. 10, 2008

8. U.S. Patent No. 4,255,711 (the "'711 patent")

9. Defendant's Response to Plaintiff's Proposed Claim Construction Statement dated April 25, 2008

10. Examiner Interview Summary dated Feb. 13, 1997

## I. INTRODUCTION

Net Results, Inc. ("Net Results") filed suit against the United States for infringement of U.S. Patent No. 5,680,048 (the "'048 patent") on August 24, 2004, claiming infringement of independent Claim 1 and dependent Claims 2 and 5 by the AN/PSS-14 product sold to the U.S. Government by Cyterra Corporation.

The AN/PSS-14 is a land mine detection system. Like the patent-in-suit, it is designed for use in military and humanitarian de-mining efforts. These land mine detection systems combine two independent, co-located sensors in a housing that is mounted on a wand. The sensor combination and mounting increase the accuracy in detection and expand the type of terrain that can be searched.

There are three phrases that the parties ask the Court to construe. Net Results asks the Court to construe "mine detection system" to mean "a system that detects mines with a high probability of detection and a low probability of false alarms"; "housing" to mean "a protective enclosure"; and "said metal detector coils concentrically surrounding said antenna" to mean "the metal detector coils and the antennas have a common center point and are in the same horizontal plane". These proposed constructions are

the inventor's intended constructions, as indicated by the language of the patent and the patent application history. Moreover, they are consistent with the use of the terms as used by those knowledgeable in the art of land mine detection.

## II. Description of Patent-in-Suit and Relevant Claims

### A. Overview of the Patent-in-Suit Technology

The '048 patent teaches a handheld device that detects metallic and non-metallic objects on, flush with, or obscured by the ground or other surfaces using ground penetrating radar ("GPR") and a metal detector. Ex. 1, U.S. Patent No. 5,680,048 col.1 ll.43-47, col.7 ll.57-64 (filed Aug. 19, 1996). The GPR and metal detector are housed and mounted on the bottom of a wand and communicate with the operator via a signal processor. Id. at col.7, ll.54-56. The combination of GPR and metal detector sensor technologies is intended to reduce "false positives" by screening out signals to pieces of scrap metal found in mined areas or former battlefields where metal detectors alone would generate false alarms. Id. at col.3, ll.51-52. The combination of GPR and metal detector sensor technologies is also intended to detect the increasing number of non-metallic mines that are not detectable by metal detectors. Id. at col.1, ll.55-56. As a result, this technology can save time and lives. Id. at col.3,

ll.43-46.




*FIG. 1*

In one embodiment of the present invention disclosed in the asserted claims, the device provides a significant improvement over the prior art through the co-location of two sensors. Id. at col.2, ll.1-3. Each sensor provides independent, coincident, and simultaneous observations of the ground for the purpose of detecting mines on, in, or below the surface. Id.

at [57] ('048 Abstract). A signal source provides controlled variations over a wide range of frequencies. Id. at col.5, ll.1-20. The integration of these technologies into a compact detection module mounted to a wand for handheld operation provides a synergy that achieves an increase in probability of detection concurrent with a reduction in the false alarm rate for mines. Id. at [57] ('048 Abstract).

### B. Phrases to be Construed as Presented in the Claims at Issue

Asserted Claims 1, 2, and 5 of the '048 patent are device claims that recite the elements for a "mine detection system." Although various exemplary embodiments are described and illustrated in the specification and drawings as preferred, the invention of the '048 patent is not limited to those specifically disclosed embodiments. Id. at col.7, ll.48-51 The claims may be construed by the ordinary meaning of their terms in context, and terms that are not necessarily consistent with an ordinary or broad meaning have been so specified within the specification, and are consistently used in the claims.

Claim 1 of the '048 patent recites:

> A mine detection system comprising:
>
> > a wand having a first end and an opposite second end;

a housing mounted onto said first end of said wand;

a signal processor supported by said wand;

a ground penetrating radar system in communication with said signal processor, said radar system including a transmitter, a receiver, and an antenna, said antenna having a first field of view; and

a metal detector system in communication with said signal processor, said metal detector system including metal detector coils, said metal detector coils having a second field of view;

said antenna and said metal detector coils being contained within said housing, said metal detector coils concentrically surrounding said antenna.

Claim 2 of the ’048 patent recites:

“The mine detection system according to Claim 1, wherein said first field of view of said antenna is substantially similar to said second field of view of said metal detector coils.”

Claim 5 of the ’048 patent recites:

“The mine detection system according to Claim 1, wherein said radar system is selected from the group consisting of stepped

continuous wave, impulse, pulse, swept FM, continuous wave, monostatic, bistatic, balance bridge and combinations thereof."

## III. LEGAL STANDARD GOVERNING CLAIM CONSTRUCTION

The interpretation of the claims of a patent is a question of law for the Court. Markman v. Westview Instruments, Inc., 52 F.3d 967, 970-71 (Fed. Cir. 1995). In order to correctly construe a disputed claim, "the court looks to 'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.'" Phillips v. AWH Corp., 415 F.3d 1303, 1314 (Fed. Cir. 2005) (quoting Innova/Pure Water, Inc. v. Safari Water Filtration Sys., 381 F.3d 1111, 1116 (Fed. Cir. 2004)). A hierarchical approach is taken to the consideration of these sources, which include in order of assessment: (1) the patent claims themselves; (2) the patent specification; (3) the prosecution history; and (4) extrinsic evidence. Phillips, 415 F.3d at 1314-19. Claim construction is the process of understanding the meaning of the claimed invention; it is not a means, however, to modify those claims. Panduit Corp. v. Dennison Mfg. Co., 810 F.2d 1561, 1576 (Fed. Cir. 1987).

The claim interpretation process begins with the words of the claim, which are given their "ordinary and customary meaning" as understood by "a person of ordinary skill in the art." Phillips, 415 F.3d at 1314 ("[T]he

claims themselves provide substantial guidance as to the meaning of particular claim terms."); Innova/Pure Water, Inc., 381 F.3d at 1116 ("A court construing a patent claim seeks to accord a claim the meaning it would have to a person of ordinary skill in the art at the time of the invention."). An express intent on the part of the patentee is required for a term to take on a meaning outside of that which is customary. Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1325 (Fed. Cir. 2002) ("In the absence of an express intent to impart a novel meaning to claim terms, an inventor's claim terms take on their ordinary meaning.").

Despite the importance of the claims themselves, they "do not stand alone." Phillips, 415 F.3d at 1315. "[C]laims 'must be read in view of the specification, of which they are a part.'" Id. (quoting Markman, 52 F.3d at 979). The specification provides additional context and scope to help construe a claim's meaning. Id. at 1317 ("It is . . . entirely appropriate for a court . . . to rely heavily on the written description for guidance as to the meaning of the claims."). Additionally, a court "should also consider the patent's prosecution history, if it is in evidence." Markman, 52 F.3d at 980 (citing Graham v. John Deere Co., 383 U.S. 1, 33 (1966)); id. ("[T]he prosecution history provides evidence of how the PTO and the inventor understood the patent.").

The language of the claim, the specification, and the prosecution history are all considered "intrinsic evidence" of the meaning of the claim. Phillips, 415 F.3d at 1313-14. When the intrinsic evidence alone will not resolve the issue, extrinsic evidence may also be considered. Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1583 (Fed. Cir. 1996) ("In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term. In such circumstances, it is improper to rely on extrinsic evidence."). Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." Markman, 52 F.3d at 980. However, extrinsic evidence "may not be used to vary, contradict, expand, or limit the claim language from how it is defined, even by implication, in the specification or file history." Bell Atl. Network Servs. v. Covad Commc'ns Co., 262 F.3d 1258, 1269 (Fed. Cir. 2001).

## IV. CONSTRUCTION OF TERMS

The three disputed phrases that require interpretation are "mine detection system," "housing" and "said metal detector coils concentrically surrounding said antenna."

DISPUTED TERM CONSTRUCTION CHART

| Claim Term or Phrase | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| 1. mine detection system | A system that detects mines with a high probability of detection, low probability of false alarms and a reasonable scan rate. | A system that detects mines. |
| 2. housing | A protective enclosure for containment of an apparatus used to prevent damage in handling or operation. | A cover. |
| 3. said metal detector coils concentrically surrounding said antenna | The metal detector coils and the antenna(s) have a common center point and are in the same horizontal plane. | The metal detector coils and the antenna are centered on a common axis and are located in basically the same space. |

What follows is a discussion of each disputed term with intrinsic and extrinsic evidence for Net Results' Term Construction. As outlined below, Net Results relies upon the patent claims, the patent specification and the prosecution history to support its constructions. Notably, the extrinsic

evidence also supports Net Results' constructions.

### A. "Mine Detection System" Properly Constructed Includes the Parameters of High Probability of Detection and Low Probability of False Alarm.

A "mine detection system" is "a system that detects mines with a high probability of detection, low probability of false alarms and a reasonable scan rate." Plaintiff's proposed construction is condensed from the specification set out in Plaintiff's "Claim Construction of the Patent-in-Suit," attached as Exhibit 2. As outlined in Claim 1, the "mine detection system" is comprised of a collocated GPR and metal detector. Ex. 1, '048 Patent at col.7 ll.53-64 (stated in full in Part 3.b). The GPR and metal detector are housed and mounted at the end of a wand. Id. Each sensor communicates with a signal processor through an antenna and receiver. Id. This design creates a compact detection module. Id. at col.3, ll.36-38. The result is a "mine detection system" that is suitable for handheld use. Id. at col.3, ll.26-27.

The object of the "mine detection system" claimed is to save lives by improved accuracy in land mine detection. See id. at col.3 ll.43-46. An interpretation of "mine detection system" that is unconcerned with accuracy is inconsistent with the "mine detection system" claimed in the '048 patent and that system's stated goal of saving lives. The '048 patent teaches a

dual sensor device that can be used in handheld operation. Id. at col.1 ll.65-67, col.3 ll.26-27. The high probability of detection is achieved by the operation of dual sensors (to view both metallic and non-metallic mines) and the mounting on a wand (to increase searchable terrain). Id. at col.1, ll.43-47. A system that creates false alarms is rendered useless, because responding to false alarms is time consuming and slows progress across terrain. Id. at col.1 ll.55-59. Moreover, a system that is not accurate will create a mortality rate that is not consistent with the stated goal of saving lives. Consequently, the mine detection system outlined in the ’048 patent has a high probability of detection and a low probability of false alarms. See id. at col.3 ll.51-52, [57] (’048 Abstract).

The term “mine detection system” is used throughout the patent to most accurately describe the focused purpose of the invention and its use. That is “a system that detects mines with a high probability of detection, low probability of false alarms and a reasonable scan rate.” See id. at col.3 ll.25-56, [57] (’048 Abstract). Evidence is given in the specification. See id. at col.1 ll.47-51 (“While there are a number of uses for the present invention . . . one of the most critical areas of use is the detection of land mines.”). Indeed, the entire focus of the specification is directed to use of the device for land mine detection. See, e.g., id. at col.2 ll.51-54 (“When

searching for mines, placing the wand too close to the ground can detonate some mines by striking the firing pins of these mines that penetrate through the ground surface, (Valmara Mines)."); id. at col.2 ll.58-59 ("One embodiment of the present invention overcomes this [Valmara Mine] problem . . . ."); id. at col.3 ll.26-46 ("The multi-sensor module is designed to be mounted on the end of a wand for handheld mine detection operations . . . . Accordingly, it is a principal object of the invention to save lives and property by providing a device for accurately detecting metallic and non-metallic mines on, flush and below a surface.").

The embodiment of the invention with a high probability of detection, low probability of false alarms and a reasonable scan rate is described by the term mine detection system. In an Office Action, the Examiner objected to the title of the invention as "not being descriptive." Ex. 3, Office Action, Serial No. 08/699353 (U.S. Patent and Trademark Office Jan. 16, 1997) (File Wrapper G 013426). Applicant, thereafter, amended the title of the invention throughout the application to read "Mine Detecting Device Having a Housing Containing Metal Detector Coils and Antenna." Ex. 4, Applicant Walter T. Wollny, Amendment and Response 10 (received Feb. 13, 1997) (File Wrapper G 013441). Applicant also amended the claims to include the preamble: "The mine detection system." Id. at 3-8 (File Wrapper G

013434-39). This became the accepted amendment to the patent and appears throughout the document. The term "mine detection system" is described in amended Claim 1 as having "a housing mounted onto a wand; a signal processor supported by the wand; a radar system in communication with the signal processor and having a transmitter, a receiver, and an antenna; and a metal detector system in communication with the signal processor and having metal detector coils, wherein the metal detector coils are concentrically surrounding the antenna within the housing." Id. at 10-11 (File Wrapper G 013441-42). There is no reason to go beyond the plain language of the patent in construing this term. Vitronics Corp., 90 F.3d at 1583 ("In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term.").

Defendant's interpretation and construction merely rephrases the words within the term. Defendant's construction of a land mine detection system as a "system that detects mines" tells us nothing and presents a construction that is too broad. Indeed, under Defendant's construction, anything or anyone who finds a mine qualifies as a "mine detection system," no matter how intentional, accidental and/or damaging the detection of that land mine may be. Under Defendant's construction, a

soldier holding a wand and walking and stamping the ground would qualify as a "mine detection system", albeit a dangerous one. Defendant's construction of this term is wholly inadequate.

By contrast, intrinsic evidence for Plaintiff's construction is wholly supported by extrinsic evidence. Specifically, Defendant's Expert Witness Dr. Lloyd Riggs, provides support for Plaintiff's Construction in his deposition testimony. Dr. Riggs was asked about a signal processor in which he provided the following response:

> In the case of a mine detection system,
> hand held system that used ground penetrating
> radar and metal detector, it would process those
> signals hopefully in a way that would maximize
> probability of detection and minimize probability
> of false alarm, and at the same time, allow a
> reasonably high scan rate.

Ex. 5, Riggs Dep. 133:12-18, May 22, 2008. <u>See also</u> Ex. 6, Riggs Dep. Ex. 1, Expert Report at 4 ("Early in the 1990s, it was certainly clear to practitioners in the field that a dire need existed to develop a handheld mine detector with high probability of detection (Pd), low probability of false alarm (Pf), and good scan rate (ability to rapidly clear a path through an area contaminated with mines).").

Net Results' expert, Dr. Dean L. Mensa, is in agreement with Dr. Riggs. Dr. Mensa states in his Expert Report that with regard to mine

detection systems "the performance measures of significance to commanders of ground troops are probability of detection, false-alarm rate, and scan-rate." Ex. 7, Mensa Expert Report at 1, ¶ 5.

It is clear there were at least three properties inherent to a land mine detection system as understood by those of ordinary skill in the art at the time of the invention: 1) high probability of detection; 2) low probability of false alarms; and 3) a reasonable scan rate. For the aforementioned reasons, Net Results urges this Court to adopt Net Results' proposed construction for the mine detection system that is the subject of the '048 patent.

### B. "Housing" Is a Protective Enclosure for Containment of an Apparatus Used to Prevent Damage in Handling or Operation.

The term "housing" is clearly understood from its use within the four corners of the '048 patent. In the present invention, the "housing" is "a protective enclosure for containment of an apparatus used to prevent damage in handling or operation" that is mounted at the end of the wand. Ex. 1, '048 Patent at col.5 ll.65-66, col.6 ll.6-7, 14-15, 22-23, 35-36, 52-53, col.7 l.54, fig.1, fig. 3-9. More specifically, the "housing" is a hemispherical plastic enclosure that contains the GPR, metal detector, and related components that make the device suitable for handheld operations. Id.

Additionally, the term "housing" must be understood in the context of the invention's use. The "mine detection system" is a device used outdoors, exposed to all natural elements, in and around variable terrain. Therefore, the term "housing" is used in the patent to describe that component of the device that contains a multi-sensor module for detecting land mines located in the outdoors in variable terrain. Id. The fragility, sensitivity, and need for specific alignment of the sensor technologies make a housing that protects the sensors necessary for the device to perform accurately. The "housing" claimed in the '048 patent is therefore "a protective enclosure." A "housing" that does not protect the multi-sensor module will lead to malfunction and/or inaccuracy in land mine detection and thus death and injury. The "housing" component is, therefore, a critical component of the '048 invention. As indicated above, Net Results' construction most accurately describes the invention. Id.

Additionally, the prosecution history provides evidence of the term's meaning as demonstrated in the Plaintiff's response to the Office Action dated January 16, 1997. See Ex. 4, Amendment and Response (File Wrapper G 013432-43). In the Office Action, the Examiner objected to the title of the invention as "not being descriptive." Ex. 3, Office Action, Serial No. 08/699353 (File Wrapper G 013426). Applicant, therefore, amended

the title of the invention throughout the application to read "Mine Detecting Device Having a Housing Containing Metal Detector Coils and Antenna." Ex. 4, Amendment and Response at 10 (File Wrapper G 013441). Entry of a title that includes the term "housing" is evidence of the importance of this component in describing the present invention. The previous title was "Surface Penetrating Object Detection System." Id. at 1 (File Wrapper G 013432). Applicant also amended the claims to include specific reference to the "housing." Id. at 3-8 (File Wrapper G 013434-39).

Indeed, the proposed amended independent Claim 1 sets forth "a housing mounted onto a wand; a signal processor supported by the wand; a radar system in communication with the signal processor and having a transmitter, a receiver, and an antenna; and a metal detector system in communication with the signal processor and having metal detector coils, wherein the metal detector coils are concentrically surrounding the antenna with the housing." Id. at 10-11 (File Wrapper G 013441-42). "The Examiner agreed [during a personal interview with Applicant and Applicant's representative on February 13, 1997] that the proposed amended claims defining the housing containing the metal detector coils and ground radar connected to the processor with a wand would define Applicant's invention over the prior art of record." Id. at 9 (File Wrapper G

013440). Further, "[a]s agreed upon during the interview, Applicant respectfully [submitted] that the prior art of record neither shows nor suggests the particular combination of elements as set forth in amended independent [Claim] 1 . . . ." Id. at 11 (File Wrapper G 013442).

Therefore, the term "housing" refers to a protective enclosure, *mounted* at the end of a wand, where the co-located GPR and metal detector are *contained*. Ex. 1, '048 Patent at col.5 ll.65-66, col.6 ll.6-7, 14-15, 22-23, 35-36, 52-53 (referring to the "protective" housing); id. at col.7 l.54 (referring to the "mounted" housing); id. at col.7 ll.65-67, fig.1, fig.3-9 (referring to and illustrating the sensors "contained" within the housing). Emphasis of the words "mounted" and "contained" is provided to demonstrate the use of these terms in the Independent Claim 1. Id. at col.7 ll.51-67. The "housing" is "mounted" at the end of the wand and the two sensors are "contained" within said housing for improved mine detection. Id. See also Vitronics Corp., 90 F.3d at 1583 ("In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term.").

The "housing" of the '048 patent is distinguished from Defendant's interpretation and construction which is a "cover." It is noteworthy that Defendant cites similar intrinsic evidence as Plaintiff in their proposed

construction; yet arrives at a much broader definition. Plaintiff submits that such a broad construction would include too wide an array of options that could not serve the intended purpose of the “housing” cited in the ’048 patent. For example, using Defendant’s construction, a sackcloth would suffice as a “housing.” Specifically, Dr. Riggs was asked about the “housing” requirements of a land mine detection system. His answer is provided in his Deposition testimony as follows:

> Let me start over. You're using this
> radar system or a combination system outdoors, is
> that correct?
> A. Right. Certainly one would do that.
> Q. How do you, how do you protect, how do
> you protect a system, the electronic components
> of such a system?
> A. Well, the -- I mean that would be
> certainly a part of, of what one was interested
> in, in pursuing via the design.
> I mean certainly there might be some
> components or parts of the system that would,
> would, in a brass board version of it at least,
> might be damaged by say moisture or rain or soil
> contamination or dust.
>
> Q. And how would you protect against those
> elements?
> A. Well, they would need to be packaged in
> some way to, to protect them from the, from the
> outside elements, you know, metallic case
> perhaps.
> Q. Would sackcloth do?
> A. Well, I mean I guess that would provide
> some protection, but generally speaking, you want

> it to be weatherproof, you know, and maybe in a
> sealed container so that it would be impervious
> to moisture, moisture and rain.

(Ex. 5, Riggs Dep. 123:8-124:12.)

As evidenced by Defendant’s expert witness in Deposition testimony, a sackcloth would not serve the intended purpose of a “housing” for the ’048 patented invention. Id. “A cover” is too broad a construction of the term “housing.” Therefore, Defendant’s proposed construction is inadequate.

It is noteworthy that additional extrinsic evidence cited by Defendant’s Claim Construction includes reference to U.S. Patent No. 4,255,711 fig.1, col.8 ll.2-10 (the “’711 patent”). The ’711 patent is directed to a coil arrangement for the search head of a metal detector. The cited text reads as follows:

> The search head 12 comprises a search head housing 18 to provide suitable support for internal components, and preferably has a flat bottom side 20. Referring now also to FIGS 2 and 3 the inductor coil arrangement, which is contained in and supported by the inner structure of the search head housing 18, may be seen to comprise a transmit coil 22 comprising an annular winding of a number of closely-spaced turns of a suitable electrical conductor.

Ex. 8, ’711 Patent at col.8 ll.2-10.

Plaintiff's construction is consistent with Defendant's '711 patent reference. Although the '711 patent makes no mention of a protective component expressly, it is implied that a "*housing* 18 to provide suitable support for internal [electrical] components" [emphasis added] for a metal detector would have a protective property for the same reasons listed above for the '048 device. Id. These include protection of fragile electrical components susceptible to malfunction if exposed to soil and moisture.

Plaintiff's construction is also supported by the dictionary definitions offered in Defendant's Claim Construction Statement which are as follows:

> housing: "3: something that covers or protects: as a: a case or enclosure (as for a mechanical part or an instrument" Merriam-Webster's Collegiate Dictionary 563 (10th ed. 1994).
>
> housing: "Containment of apparatus to prevent damage in handing or operation" Dictionary of Science and Technology 538 (1995).

(Ex. 9, Def.'s Resp. to Pl.'s Proposed Claim Construction Statement 3).

In summary, Defendant's construction for "housing" as "a cover" is too broad and, as demonstrated, inadequate. Plaintiff's construction for "housing" as a "protective enclosure for containment of an apparatus" is supported by both the intrinsic evidence and extrinsic evidence, including that offered by Defendant's expert witness in deposition testimony and the

references cited within Defendant's Claim Construction. For the aforementioned reasons, Net Results urges this Court to adopt Net Result's proposed construction for the system's protective cover.

### C. "Said Metal Detector Coils Concentrically Surrounding Said Antenna" Properly Construed Means That the Metal Detector Coils and the Antenna(s) Have a Common Center Point and Are in the Same Horizontal Plane.

"Said metal detector coils concentrically surrounding said antenna" means "the metal detector coils and the antenna(s) have a common center point and are in the same horizontal plane." Net Results' proposed construction is derived from the four corners of the '048 patent and the ordinary meaning of the term "concentric."

Intrinsic evidence in support of Plaintiff's construction includes Claim 1; Figures, 3-9; and the text at column 6, lines 1-4. In reference to Figure 3, the '048 patent reads as follows:

> As can be seen the radar antenna and metal detector coils are both co-located and co-boresighted. The antenna and coils are concentric and therefore, their line of sight is coincident.

Ex. 1, '048 Patent at col.6 ll.1-4.

The detailed description of Figure 3 of the '048 patent expressly refers to an embodiment that is concentric, co-located and co-boresighted.

Id. at col.6 ll.1-4. These three terms are distinct. The terms co-located and co-boresighted are assigned specific meaning in the text of the patent. Id. at col.2 ll.5-10, col.19 l.22 (discussed in further detail below). The term “concentric” has its ordinary meaning as indicated in Plaintiff’s original “Claim Construction of the Patent-in-Suit” on page 8: “The claims refer to ‘said metal detector coils concentrically surrounding said antenna’ with concentric generally having its ordinary meaning.” Ex. 2, Claim Construction of the Patent-in-Suit at 8.

Figure 3 most plainly illustrates what is meant by the term “concentric” and “concentrically surrounding.” Id. at fig.3 (included below). The metal detector coils are wrapped around the antenna. Id. The metal detector coils and antenna have a common center and lie in the same horizontal plane. Id. The term “concentrically surrounding” is important for at least two reasons: 1) the term describes how the antenna and the metal detector coils relate to one another; and 2) the term describes how the antenna and metal detector coils are packaged or “contained” inside the protective “housing.” Id. at col.7 ll.65-67.




FIG. 3

Indeed, the proposed amended independent Claim 1 sets forth "a housing mounted onto a wand; a signal processor supported by the wand; a radar system in communication with the signal processor and having a transmitter, a receiver, and an antenna; and a metal detector system in communication with the signal processor and having metal detector coils, wherein the metal detector coils are concentrically surrounding the antenna with the housing." Ex. 4, Amendment and Response at 11 (File Wrapper G 013442). "The Examiner agreed [during a personal interview with Applicant and Applicant's representative on February 13, 1997] that the proposed amended claims defining the housing containing the metal detector coils and ground radar connected to the processor with a wand would define

Applicant's invention over the prior art of record." Id. at 9 (File Wrapper G 013440). Further, "[a]s agreed upon during the interview, Applicant respectfully [submitted] that the prior art of record neither shows nor suggests the particular combination of elements as set forth in amended independent [Claim] 1 . . . ." Id. at 11 (File Wrapper G 013442).

From this intrinsic evidence, it is clear that the term "concentrically surrounding" describes how the antenna and the metal detector coils relate to one another, and how the antenna and metal detector coils are "contained" inside the "housing." Ex. 1, '048 Patent at col.7 ll.65-67. The term "said metal detector coils concentrically surrounding said antenna" means that "the metal detector coils and the antennas have a common center point and are in the same horizontal plane." Id. at col.6, ll.1-4, col.7, ll. 51-67, figs.3-9.

Additionally, Net Results' construction is consistent with intrinsic evidence referenced in Defendant's Claim Construction. (Ex. 9, Def.'s Claim Construction 15) (referencing id. at Claim 1, figs.3-6, col.5 ll.64-6:50 and Ex. 4, Amendment and Response at 1-12 (File Wrapper G 013432-43)). It is noteworthy that, although the radar antenna and metal detector coils of Figure 3 are described as "concentric" and other figures illustrate a concentric configuration, the specification only expressly mentions

"concentric" at column 6, lines 1-4, rather than column 5, line 64 through column 6, line 50 as indicated by Defendant's Claim Construction. Ex. 1, '048 Patent at col.6 ll.1-4. Additionally, Defendant references the '048 patent's abstract, column 2, lines 1-37, and the Examiner Interview Summary of Feb. 13, 1997 (File Wrapper G 013430). (Ex. 9, Def.'s Claim Construction 15.) However, there is no mention of the disputed term or of a "concentrically surrounding" configuration within any of those references. Ex. 1, '048 Patent at col.2, ll.1-37, [57] ('048 Abstract); Ex. 10, Examiner Interview Summary, Serial No. 08/699353 (U.S. Patent and Trademark Office Feb. 13, 1997) (File Wrapper G 013430).

Plaintiff's construction is also consistent with extrinsic evidence referenced in Defendant's Claim Construction. Specifically, Plaintiff's construction is supported by the dictionary definition offered in Defendant's Claim Construction Statement, which is as follows:

> concentric: "1: having a common center" "2: having a common axis" Merriam-Webster's Collegiate Dictionary 238 (10th ed. 1994).

Id.

In the case of the '048 patent, the common axis must specifically include the x axis, placing the metal detector coils and antenna in the same horizontal plane. This construction is supported by the intrinsic

evidence as described above. Ex. 1, ’048 Patent at col.7 ll.65-67, figs.3-6, col.5 ll.64-6:50. Net Results’ expert, Dr. Mensa, states that “concentrically surrounding” “requires that the aperture of the radar antenna and the metal detector coils *lie* in the same plane. . . . as illustrated in figures 3-9, the metal detector coils are wrapped around the aperture of the radar antenna and both the metal detector coils and the aperture of the radar antenna *lie* in the same plane.” Ex. 7, Mensa Expert Report at 4 (emphasis added). A construction of the term that requires the GPR and metal detector to lie in the same horizontal plane is necessary to distinguish the term “concentric” from the term co-located which is specifically defined in the ’048 patent as follows:

> Co-locating the metal detector coils with the radar antenna places the coils and antenna in basically the same space (see FIGS. 3-9).

Ex. 1, ’048 Patent at col.2 l.8-10.

> Co-location here means that the metal detector coils and the radar antenna are physically aligned on the same axis and therefore have vertically aligned centers of gravity thus improving stability for hand held operation.

Id. at col.2 ll.19-22.

Defendant fails to recognize this notable distinction in its proposed

construction. Defendant's construction is "the metal detector coils and the antenna are centered on a common axis and are located in basically the same space." This is clearly a condensed reformulation of the Net Results' definition for "co-location" as provided within the '048 patent. As discussed above, Figure 3 is described expressly as concentric, co-located and co-boresighted. Id. at col.6 ll.1-4. These three terms are distinct. The terms co-located and co-boresighted are assigned specific meaning in the text of the patent and concentric is given its ordinary meaning. Id. at col.2 ll.5-10, col.19 l.22. See also Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1325 (Fed. Cir. 2002) ("In the absence of an express intent to impart a novel meaning to claim terms, an inventor's claim terms take on their ordinary meaning.").

In summary, Defendant's construction for "said metal detector coils concentrically surrounding said antenna" as "the metal detector coils and the antenna are centered on a common axis and are located in basically the same space" is unworkable. It is a reformulation of the definition for the term co-location as provided in the '048 patent. Net Results' construction for "said metal detector coils concentrically surrounding said antenna" as "the metal detector coils and the antennas have a common center point and are in the same horizontal plane" is supported by the intrinsic evidence

and extrinsic evidence, including references cited within Defendant's Claim Construction and the ordinary meaning of the word "concentric."

**CONCLUSION**

For the reasons detailed above, the Net Results respectfully requests that the Court adopt the Net Results' proposed constructions of the disputed terms as follows: "mine detection system" means a system that detects mines with a high probability of detection and a low probability of false alarms; "housing" means a protective enclosure; and "said metal detector coils concentrically surrounding said antenna" means the metal detector coils and the antennas have a common center point and are in the same horizontal plane.

Inasmuch as the construction by Net Results is supported by the patent claims, the patent specification, the prosecution history and the extrinsic evidence, including the extrinsic evidence proposed by Defendant, this Court must adopt the construction proposed by Net Results.

Respectfully submitted,

Dated: July 21, 2008

s/ Thomas O. Mason
THOMAS O. MASON
Williams Mullen
8270 Greensboro Drive
Suite 700
McLean, VA 22102
Phone: (703) 760-5200
Facsimile: (703) 748-0244

Counsel for Plaintiff

# CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of July 2008, the foregoing Plaintiff's Opening Brief for Claim Construction was filed electronically. I further certify that the foregoing was served via first-class mail, postage prepaid, upon:

John A. Hudalla
U.S. Department of Justice
Commercial Litigation Branch
Civil Division
Washington, DC 20530
(202) 307-0345 (facsimile)

Counsel for Defendant The United States

s/ Thomas O. Mason
Thomas O. Mason